UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -  x
In re:

      DAVID AMRUSI,

                    Debtor.
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -  x

Chapter 7

Case No.: 23-44588-ess

## MEMORANDUM DECISION ON THE DEBTOR'S MOTION FOR AN AWARD OF COSTS, ATTORNEY'S FEES, AND DAMAGES <u>UNDER BANKRUPTCY CODE SECTION 303(i) AND FOR OTHER RELIEF</u>

Appearances:

Jared Rich, Esq.
Law Office of Jared Rich
44 Court Street (Suite 917)
Brooklyn, NY 11201

*Attorney for the Debtor*

Andrew Citron, Esq.
30 Wall Street (8th Floor)
New York, NY 11201

*Attorney for the Petitioning Creditor*
  *Wide World Inc.*

**Introduction**

Involuntary bankruptcy cases are rare.  When an involuntary bankruptcy petition is filed in good faith by one or more petitioning creditors, it can "help ensure the orderly and fair distribution of an estate by giving creditors an alternative to watching nervously as assets are depleted, either by the debtor or by rival creditors who beat them to the courthouse."  *Wilk Auslander LLP v. Murray* (*In re Murray*), 900 F.3d 53, 59 (2d Cir. 2018).

But not every involuntary bankruptcy petition is filed in good faith – and the consequences of a bankruptcy filing can be serious, even harsh, for the alleged debtor.  For this reason, the Bankruptcy Code establishes certain guardrails to deter misuse of an involuntary bankruptcy petition and provides potent remedies to an alleged debtor that is the subject of an abusive filing.  Bankruptcy Code Section 303(i)(1) provides that, where the court dismisses an involuntary bankruptcy petition other than on consent of all of the petitioning creditors and the debtor, then it may award the debtor its costs and a reasonable attorney's fee.  And Bankruptcy Code Section 303(i)(2) provides that where a petitioner has proceeded in bad faith, then the court may award consequential and even punitive damages to the alleged debtor.

The interests that are protected by these guardrails include, of course, the interests of the alleged debtor.  But they also include "the interest of the bankruptcy system, and thus the public interest," and these are interests are served by "preventing parties from exploiting the bankruptcy system for non-bankruptcy-related reasons."  *In re Murray*, 900 F.3d at 63.

Here, it seems that this involuntary bankruptcy case was, in substance, the next stop in a long path of litigation between Wide World Inc. ("Wide World"), the petitioning creditor and a commercial tenant at a property owned by the alleged debtor, David Amrusi.  When this bankruptcy filing was not successful in forestalling the eviction of Wide World's business, it

effectively abandoned the case – but that did not bring the case to an end.  Instead, Mr. Amrusi seeks costs and attorney's fees under Bankruptcy Code Section 303(i)(1), and damages under Section 303(i)(2).  And here, the record shows that he is entitled to both forms of relief.

## Jurisdiction

This Court has jurisdiction over this matter pursuant to Judiciary Code Sections 157 and 1334, and the Standing Order of Reference dated August 28, 1986, as amended by the Order dated December 5, 2012, of the United States District Court for the Eastern District of New York.  This is a core proceeding pursuant to Judiciary Code Section 157(b)(2)(A) and (O).  Venue is proper in this Court pursuant to Judiciary Code Sections 1408 and 1409.

## Selected Background and Procedural History

The path to this involuntary bankruptcy case by the petitioning creditor, Wide World, against the involuntary debtor, David Amrusi, and this motion by Mr. Amrusi seeking an award of sanctions in the form of costs, attorney's fees, and damages can be traced back more than twenty years, to the transfer of a commercial property located in Brooklyn in 2005.  *See* Petition, ECF No. 1; Cross Motion for Entry of an Order Imposing Sanctions Against the Petitioning Creditor, ECF No. 26 (the "Sanctions Motion").  It includes at least three different actions in two New York state courts, and at least four different prior bankruptcy cases, voluntary and involuntary, by or against two different debtors, before this involuntary bankruptcy case against Mr. Amrusi was filed.  These proceedings and the associated claims and assertions provide some context for this motion and the relief requested herein.  The following facts are drawn from the parties' filings in this case and do not appear to be in dispute.

*The Property and the 2009 New York Supreme Court Action*

On April 8, 2005, Second Choice LLC ("Second Choice") transferred certain commercial premises located at 660 Utica Avenue, Brooklyn, New York (the "Property") to David Vaknin and David Buchnik. *In re Second Choice LLC*, Case No. 19-45649, ECF No. 3 (Motion for Relief from Stay filed by David Amrusi and attached Summary Judgment Order of Hon. Mark I. Partnow, New York Supreme Court, Kings County, *David Amrusi v. Second Choice LLC, David Vaknin, David Buchnik, et al.*, Index No. 507535/13) (the "Stay Relief Motion" and the "Summary Judgment Order"). The transfer was reflected in a recorded deed. Summary Judgment Order at 2. In connection with the purchase of the Property, Mr. Vaknin and Mr. Buchnik executed two mortgage notes in favor of the Mendel Group Inc. ("Mendel") and Jay Kimmel in the amounts of $100,000 and $250,000. *Id.* Mr. Vaknin and Mr. Buchnik also executed a subordinate promissory note in favor of Mr. Amrusi in the amount of $121,600. *Id.* The notes of Mendel and Mr. Kimmel were jointly secured by an April 8, 2005, mortgage on the entire Property, and that mortgage was recorded. *Id.*

In November 2006, Mendel and Mr. Kimmel assigned their mortgage notes to Mr. Amrusi. Summary Judgment Order at 3. About one year later, in November 2007, the two mortgage notes and subordinate notes were combined in a new consolidated note in the principal amount of $471,600, in favor of Mr. Amrusi. That consolidated note matured on November 1, 2013. *Id.*

In 2009, Second Choice commenced an action against Mr. Buchnik and Mr. Vaknin in New York Supreme Court, Kings County. *Id.* In that action, it sought an order directing Mr. Buchnik and Mr. Vaknin to subdivide the Property and deed twenty-five percent of the Property to Second Choice, pursuant to their April 8, 2005, agreement. *Id.* Second Choice asserted in the

state court action that the parties had agreed that, after that subdivision and transfer, the mortgage would be lifted and extinguished from the twenty-five percent interest in the Property that was transferred to Second Choice and would continue only as to the seventy-five percent interest held by Mr. Buchnik and Mr. Vaknin.  *Id*.

Thereafter, the Property was subdivided into two lots, one comprising twenty-five percent and the other comprising seventy-five percent of the Property.  *Id*.  And by deed recorded January 28, 2010, Mr. Buchnik and Mr. Vaknin transferred the twenty-five percent interest to Second Choice and retained the balance.  *Id*.  According to the state court, there was no evidence in the record indicating that the mortgage was lifted or extinguished as to the twenty-five percent interest held by Second Choice following that transaction.  *Id*.

<u>The 2013 New York Supreme Court Foreclosure Action</u>

On December 2, 2013, Mr. Amrusi commenced an action to foreclose on the entire Property in New York Supreme Court, Kings County, *David Amrusi v. Second Choice LLC, David Vaknin, David Buchnik, et al.*, Index No. 507535/13 (the "Foreclosure Action"). Summary Judgment Order at 4.

In the Foreclosure Action complaint, Mr. Amrusi alleges that Second Choice, Mr. Vaknin, and Mr. Buchnik did not pay him the escrow funds required to pay real estate taxes, causing liens to be placed on the Property; did not comply with the terms, covenants, and conditions of the Note and Mortgage by defaulting in the payment of the installments of the principal and interest which became due; and did not pay the balloon payment of $471,600 as well as unpaid and accrued interest, on December 1, 2013, the maturity date of the loan.  *In re Second Choice LLC*, Case No. 19-45649, ECF No. 14 (Affirmation in Support of Request for *In Rem* Relief filed by David Amrusi and attached Complaint) (the "Affirmation in Support").

4

Second Choice answered the complaint, stating that Mr. Amrusi was aware that Mr. Vaknin and Mr. Buchnik entered into an agreement with it to subdivide the Property and create a new deed granting Second Choice a twenty-five percent unencumbered interest in the Property. The other defendants, including Mr. Vaknin and Mr. Buchnik, did not answer the complaint. Summary Judgment Order at 4-5.

On October 2, 2017, the New York Supreme Court entered a summary judgment order in favor of Mr. Amrusi.  It found that Mr. Amrusi was entitled to summary judgment against Second Choice based on his submission of a copy of the mortgage, the Consolidated and Restated Mortgage Note, and his affidavit attesting to Second Choice's default in making the required payments under the note.  Summary Judgment Order at 7-8.  The court also entered a default judgment against Mr. Vaknin and Mr. Buchnik.  Summary Judgment Order at 9.

And on November 29, 2018, the New York Supreme Court entered a judgment of foreclosure and sale in favor of Mr. Amrusi.  *In re Second Choice LLC*, Case No. 19-45649, ECF No. 3 (Stay Relief Motion and attached Judgment of Foreclosure and Sale of Hon. Mark I. Partnow, New York  Supreme Court, Kings County, *David Amrusi v. Second Choice LLC, David Vaknin, David Buchnik, et al.*, Index No. 507535/13) (the "Judgment of Foreclosure and Sale"). The Judgment of Foreclosure and Sale awards Mr. Amrusi the sum of $1,458,727.30, as well as interest from November 1, 2017, plus $1,065, for costs and disbursements in the Foreclosure Action, and any advances made by Mr. Amrusi in accordance with the Note and Mortgage. Judgment of Foreclosure and Sale at 5.  Thereafter, a sale of the Property was scheduled for February 14, 2019.  Stay Relief Motion at 4.

But on February 8, 2019, Second Choice filed an emergency application for an Order to Show Cause in New York Supreme Court, seeking a stay of all actions of Mr. Amrusi and the

5

referee in the Foreclosure Action pending a hearing on its application to vacate the judgment of foreclosure and sale. Affirmation in Support at 2. On February 11, 2019, the New York Supreme Court entered an Emergency Order to Show Cause and scheduled a hearing on Second Choice's application for March 19, 2019, and denied the temporary restraining order. *Id*. Second Choice also sought relief in the Appellate Division, Second Department, which also denied its request. *Id*.

*The First Involuntary Bankruptcy Case of Second Choice LLC*

On February 13, 2019, the day before the sale of the Property was set to occur, Mr. Vaknin filed an involuntary bankruptcy petition against Second Choice. *See In re Second Choice LLC*, Case No. 19-40882. This bankruptcy case filing stayed the Foreclosure Action proceedings, including the foreclosure sale set for February 14, 2019. Stay Relief Motion at 4.

On April 29, 2019, the Court issued an Order to Show Cause in *In re Second Choice LLC*, and directed Mr. Vaknin, as the petitioning creditor, to appear at a hearing on May 23, 2019, to show cause why the case should not be dismissed for lack of prosecution. Mr. Vaknin did not appear at the May 23, 2019, hearing, and in the absence of opposition, the Court granted the Order to Show Cause at that hearing. And on May 24, 2019, the Court issued an Order dismissing the case. *In re Second Choice LLC*, Case No. 19-40882, ECF No. 6.

*The 2013 Foreclosure Action Resumes*

Following the dismissal of *In re Second Choice LLC*, Mr. Amrusi moved in the foreclosure action for an extension of time to conduct the foreclosure sale of the Property. Amrusi Stay Relief Motion at 5, Exhibit C (Order dated July 22, 2019). The motion was granted, and the sale was rescheduled for September 19, 2019. *Id*.

*The Second Involuntary Bankruptcy Case of Second Choice LLC*

On September 19, 2019, the day of the scheduled foreclosure sale of the Property, Mr. Vaknin filed a second involuntary Chapter 7 petition against Second Choice LLC. *In re Second Choice LLC*, Case No. 19-45649. On October 3, 2019, Mr. Amrusi filed the Stay Relief Motion. *In re Second Choice LLC*, Case No. 19-45649, ECF No. 3. On October 10, 2019, the Court held a hearing on the Stay Relief Motion, at which Mr. Amrusi appeared and was heard, and no other party appeared. The Court granted the Stay Relief Motion at the October 10, 2019, hearing, and that same day, the Court entered an order modifying the automatic stay to permit Mr. Amrusi to pursue his rights under applicable law with respect to the Property, and adjourned the balance of the Stay Relief Motion, including with respect to Mr. Amrusi's request for limited prospective or *in rem* relief. *In re Second Choice LLC*, Case No. 19-45649, ECF No. 7.

From time to time, and on December 17, 2019, the Court held a continued hearing on the Stay Relief Motion, at which Mr. Amrusi appeared and was heard, and no other party appeared, and at the December 17, 2019, hearing, the Court granted *in rem* relief. On January 2, 2020, the Court entered an order further modifying the stay, providing:

> [T]he modification of the automatic stay under section 362(a) of the Bankruptcy Code as to Amrusi's interest in the Property located at 660 Utica Avenue, Brooklyn, New York 11203 provided for in the October 10 Order shall be binding in any other case filed under the Bankruptcy Code purporting to affect the Property located at 660 Utica Avenue, Brooklyn, New York 11203 that is filed not later than two (2) years after the date of this order.

*In re Second Choice LLC*, Case No. 19-45649, ECF No. 17. In reaching that conclusion, the Court also found "that the instant involuntary filing of the petition is part of a scheme to delay, hinder and defraud creditors." *Id.*

On November 18, 2019, the Court entered an Order to Show Cause Why this Case Should Not Be Dismissed Pursuant to Bankruptcy Code Section 303(j)(3) for Want of

Prosecution. *In re Second Choice LLC*, Case No. 19-45649, ECF No. 12. Next, on December 17, 2019, the Court held a hearing on the Order to Show Cause, at which Mr. Amrusi appeared and was heard. Mr. Vaknin did not appear at the December 17, 2019, hearing, and in the absence of opposition, the Court granted the Order to Show Cause at that hearing. And on January 2, 2020, the Court entered an order dismissing the case. *In re Second Choice LLC*, Case No. 19-45649, ECF No. 18.

### The 2022 Holdover Proceeding

In June 2022, Mr. Amrusi was the successful bidder at the foreclosure auction of the Property, received a referee deed, and became the owner of the Property**.** Declaration of David Amrusi, ECF No. 27 (the "Amrusi Declaration"), at 2. Soon thereafter, on August 19, 2022, Mr. Amrusi commenced a holdover eviction proceeding in New York Civil Court, Housing Part, Kings County against Wide World Inc., the petitioning creditor in this involuntary bankruptcy case, and Mr. Vaknin. *Amrusi v. Wide World Inc. and David Vaknin*, Index No. LT-319160-22/KI (the "Holdover Proceeding"). *See* Sanctions Motion at 8. Trial in the Holdover Proceeding was set for February 14, 2023. *Id.* But the day before, on February 13, 2023, Mr. Vaknin filed a Chapter 7 bankruptcy case in this Court, *In re David Vaknin*, Case No. 23-40491.

### Mr. Vaknin's First Bankruptcy Case

As noted, on February 13, 2023, on the eve of the trial in the Holdover Proceeding, Mr. Vaknin, represented by counsel, filed a voluntary Chapter 7 bankruptcy case. *In re David Vaknin*, Case No. 23-40491. That case was assigned to Judge Mazer-Marino of this Court. On March 22, 2023, Mr. Amrusi filed a motion for relief from the automatic stay in Mr. Vaknin's bankruptcy case, and on May 4, 2023, the Court entered an order modifying the automatic stay

pursuant to Bankruptcy Code Section 362(b)(10), finding that the automatic stay did not operate as a stay of the Holdover Proceeding. *In re David Vaknin*, Case No. 23-40491, ECF No. 12.

Thereafter, on April 14, 2023, the Chapter 7 Trustee moved to dismiss Mr. Vaknin's bankruptcy case on grounds, among others, that he did not appear at the Section 341 meeting of creditors and did not file a complete set of bankruptcy schedules. *In re David Vaknin*, Case No. 23-40491, ECF No. 20. On May 11, 2023, the Court held a hearing on the Chapter 7 Trustee's motion to dismiss, at which Mr. Vaknin, by counsel, appeared and was heard. Mr. Vaknin did not oppose the dismissal of his case, and the Court granted the motion. And on May 24, 2023, the Court entered an order granting the Chapter 7 Trustee's motion to dismiss and dismissing the bankruptcy case. *In re David Vaknin*, Case No. 23-40491, ECF No. 27.

*The 2023 New York Supreme Court Action and the Resumption of the 2022 Holdover Proceeding*

On May 9, 2023, Wide World brought an action against Mr. Amrusi and Mr. Buchnik in New York Supreme Court, Kings County, *Wide World Inc. v. David Amrusi and David Buchnik*, Index No. 516581/22 (the "Wide World Supreme Court Action"). In that action, Wide World obtained a temporary stay of the Holdover Proceeding. Sanctions Motion at 9. As a consequence, the Holdover Proceeding trial was adjourned to June 13, 2023. *Id*.

But the day before that trial, on June 12, 2023, Mr. Vaknin filed a second Chapter 7 bankruptcy case. *See In re David Vaknin*, Case No. 23-42079. He sought a further adjournment of the Holdover Proceeding trial due to that filing. *See* Sanctions Motion at 7. That adjournment request was not successful, perhaps because a stay relief order including *in rem* relief had been entered in Mr. Vaknin's first bankruptcy case. *See* Sanctions Motion at 6-7. And on June 13, 2023, the trial in the Holdover Proceeding was held. Sanctions Motion at 7. Some three weeks

later, on July 3, 2023, a judgment of possession was issued in favor of Mr. Amrusi against Mr. Vaknin and Wide World in the Holdover Proceeding.  *Id*.

Meanwhile, on June 20, 2023, after the trial but before the entry of judgment in the Holdover Proceeding, Wide World returned to New York Supreme Court in the Wide World Supreme Court Action to seek a stay of the proceedings in the Holdover Proceeding.  *Id*.  And on August 14, 2023, the court denied Wide World's request for a stay of those proceedings, finding that it was barred by the doctrine of res judicata by the judgment of foreclosure and sale entered in the Foreclosure Action.  *Id*.

### Mr. Vaknin's Second Bankruptcy Case

As noted, on June 12, 2023, the day before the resumption of trial in the Holdover Proceeding, Mr. Vaknin filed a second voluntary Chapter 7 case, *In re David Vaknin*, Case No. 23-42079.  In this bankruptcy case, Mr. Vaknin was not represented by counsel.  That case was also assigned to Judge Mazer-Marino.  It was incomplete in many respects, and was not identified by Mr. Vaknin as a related case to any other pending or prior bankruptcy case.  On July 31, 2023, the Court entered an order directing the Clerk's Office to dismiss Mr. Vaknin's second bankruptcy case pursuant to Bankruptcy Code 521(i)(1).  *In re David Vaknin*, Case No. 23-42079, ECF No. 18.

### This Involuntary Bankruptcy Case by Petitioning Creditor Wide World Against Mr. Amrusi

On December 12, 2023, Wide World and Dani Hode, acting *pro se*, commenced this involuntary Chapter 7 bankruptcy case against Mr. Amrusi by filing a bankruptcy petition.  The handwritten petition identifies David Amrusi as the debtor and "Dani Hode" and "Wide World Inc" as the petitioning creditor and is signed by Dani Hode as a representative of Wide World Inc.  *Id*.

Thereafter, Wide World appeared in the case by counsel, and identified itself as the petitioning creditor. *See*, *e.g.*, Emergency Motion to Stay filed by Wide World Inc., and Declaration in Support of Order to Show Cause by Andrew Citron, ECF No. 8, at 1 n.1. Wide World's counsel states that "World Wide [sic] filed an involuntary Chapter 7 petition against David Amrusi in this matter on December 12, 2023. World Wide [*sic*] retained me last Thursday," or December 21, 2023. *Id*.

At a hearing on January 2, 2024, counsel for Wide World identified Dani Hode as a member of Wide World who filed the petition. Transcript of Hearing Held on January 2, 2024, ECF No. 20 (the "January 2, 2024, Hearing Tr."), at 9:1-11.

*Wide World's Emergency Motion*

On December 26, 2023, some two weeks after this involuntary bankruptcy case was commenced, Wide World, by counsel, filed an Emergency Motion to Stay, seeking an order to stay Mr. Amrusi from proceeding with an eviction of Wide World from the Property scheduled for January 3, 2024. Emergency Motion to Stay, ECF No. 7 (the "Emergency Motion"). It argued that the eviction should be stayed pending the removal of the Wide World Supreme Court Action to this District and its referral to this Court. Emergency Motion at 4-7. Wide World described the Property as commercial premises at which Mr. Vaknin, Mr. Buchnik, and Wide World operated a full-service used car and truck dealership. Emergency Motion at 7. And it stated that it was entitled to a fifty-percent share of the Property, based on an agreement that it entered in 2005 with Mr. Amrusi. Emergency Motion at 8.

On January 2, 2024, this Court held a hearing on Wide World's Emergency Motion, at which Wide World and Mr. Amrusi, each by counsel, appeared and were heard. At the hearing, Wide World argued that Nick Kambourellis, not Mr. Vaknin, was the sole shareholder of Wide

11

World and that Mr. Vaknin, formerly the chief executive of Wide World, had not been in privity with Wide World for many years, dating at least as far back as the Foreclosure Action in 2013. January 2, 2024, Hearing Tr. at 11:19-13:23.

Wide World argued that for these reasons, among others, the New York Supreme Court in the Wide World Supreme Court Action erred in denying a stay of the Holdover Proceeding on res judicata grounds – that is, that Wide World was estopped based on an order entered in the Foreclosure Action, in which Mr. Vaknin was a defendant, and Wide World was not a party – because Wide World was not a party to the Foreclosure Action. *Id*. It also argued that, in the Holdover Proceeding, the court did not address the issues associated with ownership of the Property. *Id*.

At the conclusion of the January 2, 2024, hearing on the Emergency Motion, the Court entered an oral ruling denying the Emergency Motion. That same day, the Court entered an Order entered denying the Emergency Motion, holding that, "the Court finds and concludes that [it] lacks subject matter jurisdiction over the Stay Application because, among other reasons, consideration of the claims in that application is precluded pursuant to the Rooker-Feldman doctrine." Order Denying Motion to Stay, ECF No. 19. And on January 3, 2024, Wide World was evicted from the Property. Sanctions Motion at 6.

*Wide World's Motion to Dismiss this Involuntary Bankruptcy Case*

On January 18, 2024, Wide World filed a Motion to Dismiss this involuntary bankruptcy case in the form of a Notice of Hearing on Petitioning Creditor's Motion and Declaration of Andrew Citron, Esq., Wide World's newly-retained counsel. Petitioner's Motion to Dismiss Case, ECF No. 24 (the "Motion to Dismiss"). It stated that it was evicted from the Property on the day after this Court denied its Emergency Motion. Declaration of Andrew Citron, ECF No.

24-2, at 3.  Wide World also stated that it "was seeking to dismiss" the Wide World Supreme Court Action that it sought to remove to this Court and "filed a notice voluntarily dismissing the Removal Action" on January 5, 2024.  *Id*.  And it stated that it proposed to stipulate with Mr. Amrusi to the dismissal of the bankruptcy case, and that Mr. Amrusi did not agree to do so.  *Id*.

<u>*Mr. Amrusi's Sanctions Motion*</u>

On February 13, 2024, Mr. Amrusi filed this Sanctions Motion and supporting Declaration of Mr. Amrusi.  *See* Sanctions Motion; Amrusi Declaration).  He states that Mr. Vaknin is and has been acting as the principal of Wide World in the plethora of actions to delay the eviction of Wide World from the Property.  Sanctions Motion at 3.  Mr. Amrusi also describes the various legal proceedings that have been pursued by Mr. Vaknin and Wide World, including "multiple involuntary bankruptcy petitions [filed] for nefarious reasons related to the Premises at issue herein."  Sanctions Motion at 3-7.  He argues that sanctions and damages are appropriate here, and requests an award of costs and attorney's fees under Bankruptcy Code Section 303(i)(1) and an award of damages under Bankruptcy Code Section 303(i)(2).  Sanctions Motion at 7-11.

Mr. Amrusi also requests that the record in this case be sealed pursuant to Bankruptcy Code Section 303(k)(1), and that the Court "'enter an order prohibiting all consumer reporting agencies . . . from making any consumer report . . . that contains any information relating to such petition or to the case commenced by the filing of such petition.'"  Sanctions Motion at 11-12 (quoting 11 U.S.C. § 303(k)(2)) (omissions in original).

On February 19, 2024, Wide World filed an Affidavit of Andrew Citron in opposition to the Sanctions Motion.  Affidavit of Andrew Citron, ECF No. 28 (the "Citron Affidavit").  In substance, Wide World does not contest the facts set forth in the chronology of legal proceedings

in the state and federal courts described by Mr. Amrusi, or the general nature of the relationship between Mr. Vaknin and Wide World.  Citron Affidavit at 2-3.  But Wide World nevertheless maintains that it is a creditor of Mr. Amrusi and states it did not make any false representations in the involuntary bankruptcy petition.  *Id*.  And it states that "it leaves to the Court to draw its own conclusions from these facts, including regarding the purpose, motivation and bon[a] fides of these filings."  Citron Affidavit at 3.

On February 20, 2024, the Court held a hearing on the Motion to Dismiss, at which Wide World and Mr. Amrusi, each by counsel, appeared and were heard.  The Court granted the Motion to Dismiss at that hearing, and soon thereafter, on February 27, 2024, the Court entered an Order dismissing this involuntary bankruptcy case.  Order Dismissing Case and Directing Clerk of Court Not to Close Case, ECF No. 29.  At the same time, the Court directed the Clerk of Court not to close the case, to permit the Court to consider Mr. Amrusi's Sanctions Motion.  *Id*.

*The Evidentiary Hearing on the Sanctions Motion*

On April 10, 2025, the Court held an evidentiary hearing on the Sanctions Motion.  At that hearing, the Court heard testimony from Mr. Amrusi and received several exhibits in evidence.

Mr. Amrusi testified as to the ways in which the filing of this involuntary bankruptcy case has caused him to suffer damages.  He described the impact of the involuntary bankruptcy case on his existing credit card accounts.  As to his credit cards, Mr. Amrusi stated that several banks closed his credit card accounts in response to the filing of the case.  Transcript of Hearing Held on April 10, 2025, ECF No. 40 (the "April 10, 2025, Hearing Tr."), at 24:13-24 (concerning Home Depot), 26:10-13 (concerning Bank of America), 73:8-25 (concerning AT&T).  "I lost all my credit . . . Any place I go over there, I bring my credit.  Denied.  Denied.

Denied." April 10, 2025, Hearing Tr. at 22:11-13. The Court also received as exhibits in evidence from Mr. Amrusi letters from several banks informing him that his credit cards were being closed because of the bankruptcy filing. *See* Trial Exhs. B, C, D, E, F. As one example, a letter from the Home Depot Citibank Account stated, "[o]ur decision to close your account was based on information we received that you will be filing or may have filed bankruptcy since the date this account was opened." Trial Exh. B. Similarly, a letter from Bank of America states, "[w]e closed your account because you filed a petition for bankruptcy." Trial Exh. C.

Mr. Amrusi also described the impact of the involuntary bankruptcy case on several long-standing credit lines that he maintained. He testified that after the bankruptcy case was filed, approximately $90,000 in lines of credit were closed. April 10, 2025, Hearing Tr. at 36:7-39:1 (addressing Experian Credit Line Report). Mr. Amrusi stated that he had maintained many of these closed credit lines for more than twenty years. April 10, 2025, Hearing Tr. at 38:19-20. At the same time, on cross-examination, Mr. Amrusi acknowledged that at least two of his credit lines remain open and available to him. April 10, 2025, Hearing Tr. at 68:19, 71:7.

And Mr. Amrusi described the negative impact of the involuntary bankruptcy case on his credit score: "I used to have a credit score over 800 always. Now, it's no more – less than 700, I mean. Less than 700. Every time I apply for something, they always – they always deny it." April 10, 2025, Hearing Tr. at 48:14-16.

As to specific examples of the impact of these matters, Mr. Amrusi testified that, as a result of the bankruptcy case's impact on his credit score, he was denied a car lease. April 10, 2025 Hearing Tr. at 50:25. And he testified that he was not able to borrow the funds to begin a planned construction project, including in connection with the necessary permit or pay an architect he had hired to continue working on the project. April 10, 2025, Hearing Tr. at

51:4-10, 82:2-16.  But on cross-examination, Mr. Amrusi also acknowledged that he had not made a formal application for credit or a loan to continue construction of a building on his property or commenced construction (other than to build a fence) before this involuntary bankruptcy case was filed.  April 10, 2025, Hearing Tr. at 81:25.  He also acknowledged that he could proceed with construction if his credit score improves in the future.  April 10, 2025, Hearing Tr. at 83:25-84:6.

In addition, Mr. Amrusi testified as to some of the practical consequences and frustration that he has experienced resulting from the filing of the involuntary bankruptcy case, as well as the harm to his reputation.  As he explained:

> "I can't rent a car . . . Every time I [try to], I get [an] inquiry.  So [the] inquiry make[s] my – my score more down, and I lose another credit. . . . I go to the store. They don't – they're not allowed to accept my credit.  Any – anything I try to do is not – is not working."

April 10, 2025, Hearing Tr. at 50:21-51:10.  And he offered exhibits in support of this testimony, including solicitation letters from firms offering services to bankruptcy debtors.  *See* Trial Exhs. J (1 $ Wiser Consumer Education Inc.), K (Sage Personal Finance).

And finally, Mr. Amrusi testified that he has incurred significant fees, including legal fees, in connection with addressing and responding to all of these matters.  April 10, 2025, Hearing Tr. at 51:11-52:10.  He offered in evidence his attorney's billing statement for fees incurred during this involuntary bankruptcy case, including the fees incurred in connection with this Sanctions Motion.  *See* Trial Exh. A.

On April 28, 2025, Mr. Amrusi filed a post hearing statement.  Post Hearing Statement of Alleged Debtor David Amrusi, ECF No. 42 (the "Amrusi Post Hearing Statement").  He states that "[t]he evidence presented at the hearing established that the involuntary Chapter 7 petition filed against Debtor was frivolous, filed in bad faith, and intended solely to delay lawful state

court eviction proceedings concerning the [Property]." Amrusi Post Hearing Statement at 1.  He

argues that his testimony shows "a pattern of bad faith filings and serial delay tactics

orchestrated by . . . Wide World . . . and its principal [Mr.] Vaknin," and "details the specific

damages [Mr. Amrusi] incurred as a result of the present filing." *Id.*

Mr. Amrusi also summarizes the evidence, including his testimony and the exhibits that

he offered, in detail.  Amrusi Post Hearing Statement at 1-2.  He points to the applicable legal

standards under Bankruptcy Code Section 303(i), including the rule that "a debtor is

presumptively entitled to attorneys' fees and costs upon dismissal of an involuntary petition."

Amrusi Post Hearing Statement at 3.

As to damages, Mr. Amrusi states that Bankruptcy Code Section 303(i)(2)(B) "authorizes

the Court to award punitive damages where the filing is shown to have been made in bad faith."

*Id.*  And he notes that bankruptcy courts in this District have held "that it is proper for punitive

damages awards to be calculated as a multiple of attorneys' fees in cases involving bad faith

involuntary petitions."  Amrusi Post Hearing Statement at 3 and n.1 (citing *In re Anmuth*

*Holdings LLC*, 600 B.R. 168, 186 (Bankr. E.D.N.Y. 2019)).

And as to the question of bad faith, Mr. Amrusi states that "[t]he hearing record

overwhelmingly supports a finding of bad faith."  Amrusi Post Hearing Statement at 3.  He

argues:

> Wide World Inc. had no valid claim against Debtor.  They were the tenant of the
> alleged debtor, not a creditor.  The petition was timed to obstruct state court
> proceedings, with no legitimate bankruptcy purpose.  The filing fits into a broader
> documented pattern of serial abuses of the bankruptcy system by Wide World Inc.
> and its principal David Vaknin, as recognized by [this Court's] prior finding.

Amrusi Post Hearing Statement at 3.

As to damages, including an award of punitive damages, Mr. Amrusi states:

Debtor incurred substantial legal fees defending against the filing, supported by detailed billing records submitted to the Court. Debtor also experienced broader harm, including closure of long-standing credit accounts, reputational damage, and an inability to obtain financing.

Accordingly, punitive damages are appropriate and necessary to deter future misconduct. Debtor respectfully submits that an award of punitive damages in an amount approximately four times the attorneys' fees incurred would be just and proportionate under the circumstances.

*Id*.

On May 2, 2025, Wide World filed a post hearing statement, in the form of a declaration by its counsel, Andrew Citron, made under the penalty of perjury pursuant to Judiciary Code Section 1746. Post Hearing Submission, ECF No. 43 (the "Wide World Post Hearing Statement").

In its submission, Wide World acknowledges that:

[It] does not contest Amrusi's testimony as to the chronology of prior legal proceedings including bankruptcy filings and that the bankruptcy filings delayed state court eviction proceeding (Tr. 11); David Vaknin being the principal of Wide World (Tr. 7); and Amrusi losing $90,000 worth of credit from five cards as a result of the filing, as set forth in his credit report.

Wide World Post Hearing Statement at 2 (footnotes omitted).

Significantly, Wide World also states that it "does not defend the filing of its petition, other than noting that it is a creditor of Amrusi." *Id*. And it continues to assert that "both Vaknin and World Wide [*sic*] have an interest in the Property." Wide World Post Hearing Statement at 2 n.4. Wide World asks the Court to "draw whatever conclusions it believes are appropriate regarding the purpose, motivation, and bon[a] fides of the filings at issue in this case, other than as set forth below." Wide World Post Hearing Statement at 3.

Wide World points out that Mr. Amrusi does not "claim he established any damages proximately caused by the filing of the petition or the amount of any such damages," and instead,

"only seeks attorney's fees and punitive damages." *Id*. That is, in substance, Wide World states that the Court should consider an award of attorney's fees under Section 303(i)(1), and punitive damages under Section 303(i)(2)(B), but not "damages proximately caused by such filing," under Section 303(i)(2)(A), in deciding the Motion for Sanctions. Wide World also points to the absence of specific and supported allegations of compensatory damages, and asserts that Mr. Amrusi "did not establish actual, quantifiable damages proximately caused by the filing." Wide World Post Hearing Statement at 4. And it questions the persuasiveness of Mr. Amrusi's testimony as to his credit score, his inability to lease a car, and his expenses in connection with the possible construction of a building on his property. Wide World Post Hearing Statement at 4-5.

Wide World also responds that Mr. Amrusi is not entitled to an award of punitive damages in the amount of four times his attorney's fees, for several reasons. It states that "[i]n mitigation of the amount of sanctions, Wide World asks the Court to consider that it offered Amrusi to dismiss this case shortly after the Court's ruling on its emergency application . . . and only offered limited opposition to Amrusi's application." Wide World Post Hearing Statement at 5.

And Wide World notes that the Court dismissed the involuntary bankruptcy petition on its application, that it has "consented to sealing of all records of the court relating to this petition [pursuant to Bankruptcy Code Section] 303(k)(1); and [to] prohibiting consumer reporting agencies from making any consumer report that contains any information related to the bankruptcy petition [pursuant to Bankruptcy Code Section] 303(k)(2)." Wide World Post Hearing Statement at 5-6.

Finally, Wide World argues that Mr. Amrusi did not come forward with proof that:

> [It] made threats including threats of involuntary bankruptcy; was motivated by malice, vindictiveness, or a desire to embarrass, harass, or pressure, or intentionally inflict injury through the filings; showed a lack of remorse (to the contrary, as stated above, Wide World promptly sought to dismiss and consented to relief which would mitigate the consequences to Amrusi) or acted in contravention of legal advice.

Wide World Post Hearing Statement at 6.

### Discussion

This Sanctions Motion calls for the Court to address a series of questions, including questions that are specific to the requirements to commence, and the consequences of a voluntary dismissal of, an involuntary bankruptcy case. These questions arise in the context of Bankruptcy Code Section 303, which sets out the roadmap for the commencement and dismissal of an involuntary bankruptcy case.

At the outset, it is worth noting that involuntary bankruptcy cases are not the norm. Rather, "[m]ost bankruptcy filings are initiated as voluntary petitions under 11 U.S.C. § 301 by a debtor seeking a fresh start. Far fewer are initiated as involuntary petitions by creditors, much less a single creditor, under 11 U.S.C. § 303." *Wilk Auslander LLP v. Murray* (*In re Murray*), 900 F.3d 53, 59 (2d Cir. 2018) (citing Administrative Office of the United States Courts statistics). And as one bankruptcy court has observed, "involuntary bankruptcy is an extreme remedy with dire consequences." *In re Anmuth Holdings*, 600 B.R. at 188 (quotation marks omitted).

Two questions that are relevant to the commencement of this bankruptcy case are who may be a petitioning creditor, and what is the meaning and consequence of a "bona fide dispute as to liability or amount" of a creditor's claim. 11 U.S.C. § 303(b)(1). *See* Sanctions Motions at 10; Citron Affidavit at 3 n.7.

Another question is where, as here, the petitioning creditor elects voluntarily to dismiss the bankruptcy case, what is the meaning of dismissal "on consent of all petitioners and the debtor" – must the debtor actively oppose the dismissal of the involuntary bankruptcy case to preserve its rights to pursue recovery of its costs, attorney's fees, and damages, including consequential and punitive damages?  11 U.S.C. § 303(i).

And finally, upon the dismissal of the case if the debtor does not consent, what must the debtor show to recover its "costs," "a reasonable attorney's fee," and as to a "petitioner that filed the petition in bad faith," its damages, including "damages proximately caused by [the] filing" and "punitive damages"?  11 U.S.C. §§ 303(i)(1); 303(i)(2).  And has that standard been met by Mr. Amrusi here?

The Court considers these questions in turn.

### *Whether Wide World Is Eligible To Be a Petitioning Creditor Under Bankruptcy Code Section 303*

As a threshold matter, to commence an involuntary bankruptcy case, a petitioning creditor must be a creditor of the alleged debtor.  And that creditor must be "either a holder of a claim against such person that is not contingent as to liability or the subject of a bona fide dispute as to liability or amount."  11 U.S.C. § 303(b)(1).

Mr. Amrusi asserts that Wide World is not, and never has been, his creditor.  Instead, he states that that "the relationship between the parties was one where I was the landlord and the petitioning creditor was the tenant.  They owed me, not the other way around.  I have never been a debtor to the petitioning creditor."  Amrusi Declaration at 1-2.  And he notes that:

> In the instant case, the petitioning creditor filed exhibits to support its claim that it is a creditor of the involuntary Debtor.  Those documents, bank statements and various receipts have already been presented by the petitioning creditor to the Supreme Court in the [Wide World Supreme Court Action].  The petitioning creditor evidenced those documents in that case to support its claims in that case

of alleged ownership of the Premises.  Now, the petitioning creditor is using the same documents to support its[] allegation that it is a creditor of the alleged debtor.  The allegation has no merit.  The Alleged Debtor is not a Debtor to Wide World, Vaknin, or anyone else related to the Premises.

Sanctions Motion at 10.

Wide World responds that it "cannot agree that it is not a true creditor of Amrusi."

Citron Affidavit at 3 n.7.  It asserts:

Amrusi acknowledges that Wide World filed exhibits to support its claim that it is a creditor of Amrusi.  These exhibits include documents (contracts), bank statements and various receipts . . . in the [Wide World Supreme Court Action.] Amrusi neither explains nor contests the validity of these documents, but rather argues that Wide World already presented the documents to the Supreme Court in the [Wide World Supreme Court Action] to support its claims in that case of alleged ownership of the Premises.

[O]ne of Wide World's five causes of action in the [Wide World Supreme Court Action] is for damages for Amrusi's fraud.  Similarly, Amrusi's conclusory statement that his relationship to Wide World is not debtor-creditor is entitled to no evidentiary weight.

*Id*. (citations omitted).

The Second Circuit has provided helpful guidance to aid in discerning whether a petitioning creditor's claim is subject to a bona fide dispute.  In substance, this is an objective test, not a subjective one, and calls for the court to consider the possibility of either a legal or a factual dispute.  As the Second Circuit explained:

Courts apply an objective test in determining whether a bona fide dispute exists. *Key Mech. Inc. v. BDC 56 LLC* (*In re BDC 56 LLC*), 330 F.3d 111, 117-18 (2d Cir. 2003), *abrogated on other grounds by Adams v. Zarnel* (*In re Zarnel*), 619 F.3d 156 (2d Cir. 2010).  A court must "determine whether there is an objective basis for either a factual or a legal dispute as to the validity of the debt."  [*In re BDC 56*, 330 F.3d] at 117 (internal quotation marks and alteration omitted). There is a bona fide dispute if "there is either a genuine issue of material fact that bears upon the debtor's liability or a meritorious contention as to the application of law to undisputed facts."  *Id.*

*Crest One Spa v. TPG Troy, LLC* (*In re TPG Troy, LLC*), 793 F.3d 228, 234 (2d Cir. 2015).

The Second Circuit also found that this is consistent with Congress's intent in adopting Section 303. That is, Congress "intended to disqualify a creditor whenever there is any legitimate basis for the debtor not paying the debt, whether that basis is factual or legal." *In re TPG Troy*, 793 F.3d at 234 (quotation marks omitted). This is because "[a]n involuntary bankruptcy case cannot be the means of pressuring a debtor to pay a legitimately disputed debt." *Id*.

And the Second Circuit observed:

> Critically, while a court is called upon to determine the presence of a bona fide dispute, it is not called on to resolve such dispute. [*In re BDC 56*, 330 F.3d] at 118. The petitioning creditor bears the initial burden of coming forward with evidence to "establish a prima facie case that no bona fide dispute exists. Once a prima facie case has been established, the burden shifts to the debtor to demonstrate the existence of a bona fide dispute." *Id*.

*In re TPG Troy*, 793 F.3d at 234. That is, for a petitioning creditor to be eligible to commence an involuntary bankruptcy case, it must establish that it is a creditor of the alleged debtor, and if it does, it must also establish "a prima facie case that no bona fide dispute exists" as to the debt. *In re BDC 56*, 330 F.3d at 118.

Here, the record shows that Wide World has come up short at the first step of this test. That is, Wide World has not shown that it is a creditor of Mr. Amrusi. Rather, Wide World is, indisputably it seems, a former tenant, and Mr. Amrusi is, also indisputably it seems, a former landlord of Wide World's business at the property.

Instead, as the record also shows, Wide World and its principal Mr. Vaknin have been engaged in a protracted series of proceedings in New York Supreme Court and the bankruptcy court, among other venues, with respect to Mr. Amrusi's efforts to execute a warrant of eviction to remove Wide World and its business operations from the Property. These include disputes in the New York Supreme Court dating back to 2009, the Foreclosure Action and the Holdover

Proceeding.  These also include several bankruptcy cases in this Court, including the first

involuntary bankruptcy case of Second Choice, *In re Second Choice LLC*, Case No. 19-40882;

the second involuntary bankruptcy case of Second Choice, *In re Second Choice LLC*, Case No.

19-45649, the first voluntary bankruptcy case of Mr. Vaknin, *In re David Vaknin*, Case No.

23-40491; the second voluntary bankruptcy case of Mr. Vaknin, *In re David Vaknin*, Case No.

23-42079, and of course, this involuntary bankruptcy case against Mr. Amrusi.

And here, the record also shows that even if somehow, Wide World could claim that it is

a creditor of Mr. Amrusi, any claim it might have against him is plainly "the subject of a bona

fide dispute as to liability or amount."  11 U.S.C. § 303(b)(1).  This is because, among other

reasons, and as this Court found in denying Wide World's Emergency Application, its claims are

barred by the Rooker-Feldman doctrine.  January 2, 2024, Hearing Tr. at 37:14-39:2.

Alternatively, Wide World's assertion that it is a creditor of Mr. Amrusi is also barred by

the doctrine of claim preclusion.  As this Court found at the January 2, 2024, hearing, "'[a]

judgment of foreclosure and sale entered against a defendant is final as to all questions at issue

between the parties, and concludes all matters of defense which were or might have been

litigated in the foreclosure action.'"  January 2, 2024, Hearing Tr. at 39:3-19 (quoting *Wilson v.

HSBC Bank, USA*, 2018 WL 1449204, at *10 (S.D.N.Y. Mar. 22, 2018)).

That is, here, the record shows that Wide World lacks a persuasive basis in law or fact to

state it has any claim at all against Mr. Amrusi, much less one that is not a subject of a bona fide

dispute.

For these reasons, and based on the entire record, the Court finds and concludes that

Wide World is not eligible to be a petitioning creditor in this involuntary bankruptcy case against

Mr. Amrusi because it is not "a holder of a claim against [him]."  11 U.S.C. § 303(b)(1).  And

even if somehow it was, its claim is plainly "contingent as to liability or the subject of a bona

fide dispute as to liability or amount." *Id*.

### Whether Mr. Amrusi May Seek Relief Under Bankruptcy Code Section 303(i)

The next threshold question that the Court considers is whether Mr. Amrusi has waived

his right to seek an award of costs, attorney's fees, and damages under Bankruptcy Code Section

303(i). That Section states, in relevant part, that a debtor may seek this relief "[i]f the court

dismisses a petition . . . other than on consent of all petitioners *and the debtor*." 11 U.S.C.

§ 303(i) (emphasis added). Put another way, did Mr. Amrusi somehow waive his right to seek

this relief by not opposing Wide World's Motion to Dismiss?

As one court of appeals has explained, a reading of Bankruptcy Code Section 303(i) that

required the alleged debtor actively to oppose a petitioning creditor's motion to dismiss would

present the alleged debtor with a "Hobson's choice" between prompt dismissal of the involuntary

petition and the stigma attached to it, or prolonging the case in order to pursue fees. *R. Eric

Peterson Constr. Co. v. Quintek, Inc.* (*In re R. Eric Peterson Constr. Co.*), 951 F.2d 1175, 1180

(10th Cir. 1991). And such a reading would lead to the "ridiculous result" of requiring a court to

hold an unnecessary and burdensome hearing on a motion to dismiss that neither party actually

wants. *Id*. As the Tenth Circuit explained:

> To make matters more absurd, Quintek's interpretation of consent would require
> the bankruptcy court to waste its scarce resources holding a hearing that neither
> party really wants. If the debtor is required to oppose the motion to dismiss, the
> bankruptcy court must hear the motion although in reality neither the petitioning
> creditors nor the debtor wish the bankruptcy proceeding to continue. We agree
> with the bankruptcy court that construing consent in this manner to require such
> actions against self-interest by the debtor leads to a "ridiculous result."

*Id*.

In the Sanctions Motion, Mr. Amrusi takes care to reserve his rights to seek relief under

Bankruptcy Code Section 303(i). He states:

> The Alleged Debtor desires for this frivolous involuntary bankruptcy to be
> dismissed. However, 11 U.S.C. § 303(i) only allows for judgment against the
> petitioning creditor "if the court dismisses a petition under this section *other than
> on* consent of all petitioners and the debtor". (*emphasis added*). This cross
> motion is being made so that the petitioning creditor is held liable for the misuse
> and abuse of this court and the damages that it caused to the Alleged Debtor by
> filing this case. Alleged Debtor has not objection to dismissal of the case but does
> not in any way intend to waive or impair his right to maintain his claims under 11
> U.S.C. § 303(i).

Sanctions Motion at 3.

In response, Wide World acknowledges Mr. Amrusi's assertion that he "does not in any

way intend to waive or impair his right to maintain his claims under" Bankruptcy Code Section

303(i). Citron Affidavit at 2. And it invites the Court to "draw whatever conclusions it believes

are appropriate regarding Amrusi's application for sanctions" and other relief. *Id*.

Here again, the starting point for considering this threshold question is the plain text of

Bankruptcy Code Section 303(i). It provides the framework for the consideration of a request for

costs, attorney's fees, and damages when an involuntary bankruptcy case is dismissed. Section

303(i) states that "if the court dismisses a petition under this section other than on consent of all

petitioners and the debtor, and if the debtor does not waive the right to judgment under this

subsection," then that debtor may seek costs, "a reasonable attorney's fee," or compensatory or

punitive damages. 11 U.S.C. §§ 303(i)(1), (2).

So, the first question to be addressed in a request for attorney's fees, costs, and damages

under Section 303(i) is whether the dismissal was on consent of "all petitioners and the debtor."

11 U.S.C. § 303(i). Put another way, as one court explained, a recovery under Section 303(i)

requires "that dismissal is not on consent and the debtor has not waived its right to relief." *In re

Anmuth Holdings*, 600 B.R. at 185.

But courts agree that Section 303(i)'s requirement of lack of consent does not mean that the alleged debtor must somehow resist the dismissal of the bankruptcy case.  As one commentator explained, "[n]onconsent . . . does not require that the debtor contest the creditors' voluntary dismissal, assuming that dismissal occurs pursuant to section 303(j)(1)."  2 Collier on Bankruptcy ¶ 303.33[2], at 303-109 (Richard Levin & Henry J. Sommer eds., 16th ed.).

And surely, this makes sense.  It would be ironic indeed if an involuntary debtor were required to oppose the dismissal of the unwanted involuntary bankruptcy petition in order to pursue its claim for costs, attorney's fees, and damages.  Again, as the Collier treatise notes, "capturing a debtor in a 'no-win' situation is not practical either, if all parties favor dismissal and a preservation of claims under section 303(i); denying the damage claim would force debtors *not* to permit or consent to dismissal."  2 Collier on Bankruptcy ¶ 303.33[2], at 303-109 to 303-110 (Richard Levin & Henry J. Sommer eds., 16th ed.) (emphasis in original).

Courts agree with this common-sense conclusion.  As the Tenth Circuit explained, "[a] debtor should not be required actively to oppose dismissal of an involuntary bankruptcy in order to preserve a claim for damages under Section 303(i) if that petition was wrongfully brought." *R. Eric Peterson Constr. Co.,* 951 F.2d at 1180.  *See In re Anmuth Holdings,* 600 B.R. at 185-86 (observing that "[w]here dismissal was upon either a petitioning creditor's motion or a joint motion, the availability of § 303(i) relief turns on whether dismissal was granted on the petitioner's motion, pursuant to § 303(j)(1), or on consent, pursuant to § 303(j)(2).").

In addition, a debtor is not required to choose one or another of the remedies identified in Section 303(i).  Instead, courts agree that if the requirements of Section 303(i) are met, a debtor may recover both costs and attorney's fees under Section 303(i)(1), and compensatory and punitive damages under Section 303(i)(2).  That is, "[a] debtor can recover under both

27

paragraphs (1) and (2) of section 303(i)."  2 Collier on Bankruptcy ¶ 303.33[3], at 303-110

(Richard Levin & Henry J. Sommer eds., 16th ed.) (citing cases).

And finally, the decision whether to award costs, attorney's fees, and damages is

committed to the sound discretion of the court.  As the bankruptcy court in *In re Anmuth*

*Holdings* observed, "[i]t is settled law that an award under § 303(i) is within the discretion of the

Bankruptcy Court."  *In re Anmuth Holdings*, 600 B.R. at 184.

Here, the record shows that immediately following this Court's denial of its Emergency

Motion to stay Mr. Amrusi from proceeding with an eviction of Wide World and its used car and

truck dealership from the Property, Wide World moved to dismiss this involuntary bankruptcy

case.  That is, on December 12, 2023, Wide World filed this involuntary bankruptcy case against

Mr. Amrusi; on December 26, 2023, Wide World filed the Emergency Application; on January

2, 2024, this Court denied that application; and on January 18, 2024, Wide World moved to

dismiss this case.  *See* ECF Nos. 1, 7, 19, 24.  And in its Motion to Dismiss, Wide World states

that it "was seeking to dismiss both the Removal Action and [the bankruptcy ] case, and

separately, that "Wide World would like to dismiss the case, but [Mr. Amrusi, by his counsel],

indicated that his client would not consent to do so."  Motion to Dismiss at 3.

And here, the record also shows that, as Mr. Amrusi states in his Sanctions Motion,

"Alleged Debtor has no objection to dismissal of the case but does not in any way intend to

waive or impair his right to maintain his claims under 11 U.S.C. § 303(i)."  Sanctions Motion at

3.  To the same effect, as set forth in the parties Joint Pre-Hearing Statement, the parties do not

dispute that "[c]ounsel for Wide World advised counsel for Mr. Amrusi by email [on January 11,

2024] that Wide World would like to stipulate to dismiss the case."  Joint Pre-Hearing Statement,

ECF No. 37 ("Joint Pre-Hearing Statement"), at 2.  That is, while Mr. Amrusi did not formally

oppose the Motion to Dismiss, he was attentive not to consent to the dismissal, and indeed, declined Wide World's invitation to enter into a stipulation to that effect. *See* Motion to Dismiss at 3. In addition, he specifically reserved his right to pursue a judgment under Bankruptcy Code Section 303(i), including the costs, attorney's fees, and damages that he seeks in this Sanctions Motion. Sanctions Motion at 6. And that is sufficient to preserve Mr. Amrusi's rights to proceed here.

For these reasons, and based on the entire record, the Court finds and concludes that Mr. Amrusi may seek relief under Bankruptcy Code Section 303(i), because, among other reasons, he did not "consent" to the dismissal of the bankruptcy petition and did not "waive the right to judgment" under Section 303(i), including for "costs," "a reasonable attorney's fee," or "damages." 11 U.S.C. §§ 303(i)(1), 303(i)(2).

### *Whether Mr. Amrusi Is Entitled to an Award of Costs and Attorney's Fees Under Bankruptcy Code Section 303(i)(1)*

The next question that the Court considers is whether Mr. Amrusi has satisfied the requirements for an award of his costs and attorney's fees incurred as a result of Wide World bringing this involuntary bankruptcy case against him.

Mr. Amrusi argues that under Bankruptcy Code Section 303(i) and the caselaw in this District and Circuit, he is presumptively entitled to attorney's fees and costs. Sanctions Motion at 9 (citing *In re Anmuth Holdings*, 600 B.R. at 186). Viewed another way, he points out that "'[t]he burden of proof is on the petitioner to justify a denial of costs and fees.'" Sanctions Motion at 9 (quoting *In re Anmuth Holdings*, 600 B.R. at 186).

In addition, Mr. Amrusi argues that to the extent the statutory presumption is not dispositive, courts consider the totality of the circumstances, and weigh factors including "'(1) the merits of the involuntary petition, (2) the role of any improper conduct on the part of the

alleged debtor, (3) the reasonableness of the actions taken by the petitioning creditors; and (4) the motivation and objectives behind the filing of the petition.'"  Sanctions Motion at 9 (quoting *In re Anmuth Holdings*, 600 B.R. at 188).

And here, Mr. Amrusi argues, Wide World "is not a true creditor of the alleged debtor." Sanctions Motion at 10.  Instead, he states, "[t]he sole purpose of the petition was to attempt to stay the eviction and is merely the latest in a long string of bad faith filings solely intended to stay litigation."  *Id*.  He argues that the proof Wide World offered to demonstrate it is a creditor is, in substance, that same proof it offered in the state court actions to demonstrate an ownership interest in the Property, which has been rejected by those courts.  Sanctions Motion at 12.

Wide World responds that it cannot agree that it is not a true creditor.  Citron Affidavit at 3 n.7.  It maintains that it is a creditor of Mr. Amrusi on the grounds set forth in the Emergency Motion and supporting documents.  Citron Affidavit at 3 n.7 (citing Emergency Motion and ECF No. 15).  Wide World also points to the complaint filed in the Wide World Supreme Court Action, and its claim that Wide World is entitled to a fifty percent share of the Property and damages for fraud.  Citron Affidavit at 3 n.7 (citing Wide World Supreme Court Action complaint, Exh. A to Emergency Motion, ECF No. 7-2).  And it asserts that Mr. Amrusi does not contest the validity of these documents.  Citron Affidavit at 3 n.7.

Upon the dismissal of an involuntary bankruptcy case, the question of an award of costs and attorney's fees under Bankruptcy Code Section 303(i)(1) is generally a straightforward one. As the Second Circuit has stated, "[w]hen an involuntary petition is dismissed, 'there is a presumption that costs and attorney's fees will be awarded to the alleged debtor.'"  *In re TPG Troy*, 793 F.3d at 235 (quoting *In re Mountain Dairies, Inc.*, 372 B.R. 623, 637 (Bankr. S.D.N.Y. 2007)).

And as the plain terms of Section 303 make clear, "[u]nder the terms of the statute, bad faith is not a prerequisite to an award of costs and attorney's fees under § 303(i)(1)." *Lubow Mach. Co. v. Bayshore Wire Prods. Corp.* (*In re Bayshore Wire Prods. Corp.*), 209 F.3d 100, 105 (2d Cir. 2000). That is, "[a]t bottom, Section 303(i)(1) is a fee-shifting provision that requires no showing of bad faith, and aims to keep the putative estate whole." *In re TPG Troy*, 793 F.3d at 235.

To the same effect, the Court may award attorney's fees incurred in connection with seeking to recover compensatory or punitive damages under Bankruptcy Code Section 303(i)(2). *See In re Anmuth Holdings*, 600 B.R. at 187 (citing *In re TPG Troy*, 793 F.3d at 235). This is so even if those claims are ultimately denied. *Id.*

To be sure, courts recognize that the statutory presumption in favor of an award of attorney's fees may be rebutted. And in considering whether the presumption has been overcome, courts apply a "totality of the circumstances" test, weighing several factors:

> In awarding attorneys' fees and costs: "Most of the courts . . . have adopted a totality of the circumstances test, in which certain factors are to be considered. These include (1) the merits of the involuntary petition; (2) the role of any improper conduct on the part of the alleged debtor; (3) the reasonableness of the actions taken by the petitioning creditors; and (4) the motivation and objectives behind the filing of the petition."

*In re TPG Troy*, 793 F.3d at 235 (quoting *In re Taub*, 438 B.R. 761, 775 (Bankr. E.D.N.Y. 2010)) (omission in original). *See* 2 Collier on Bankruptcy ¶ 303.33 [1], at 303-107 (Richard Levin & Henry J. Sommer eds., 16th ed.). The Court considers these mitigating factors in turn.

As to the first factor, the merits of the involuntary petition, here, the record shows that this factor weighs in favor of an award of attorney's fees and costs. This is because, among other reasons, and as this Court has concluded above, it appears from the record that Wide World is not a creditor of Mr. Amrusi. Instead, at the time this involuntary bankruptcy case was

commenced, Wide World was a tenant, and Mr. Amrusi was a landlord, of Wide World's business at the property. And as also noted above, at a very minimum, Wide World's claim is plainly subject to a "bona fide dispute as to liability or amount." 11 U.S.C. § 303(b)(1).

As to the second factor, the role of any improper conduct on the part of Mr. Amrusi as the alleged debtor, here, the record shows that this factor, too, weighs in favor of an award of attorney's fees and costs. The record is bereft of evidence – let alone credible and persuasive evidence – that there has been any improper conduct on the part of Mr. Amrusi, the alleged debtor.

As to the third factor, the reasonableness of the actions taken by Wide World as the petitioning creditor, here as well, the record shows that this factor weighs in favor of an award of attorney's fees and costs. Wide World has pointed to the steps that it has taken following the denial of its Emergency Motion to bring this case to a prompt close, including seeking the dismissal of the case and stating that it "does not defend the filing of its petition, other than noting that it is a creditor of Amrusi." Wide World Post Hearing Statement at 2.

But Wide World's decision to abandon this case following the denial of its request for emergency relief to stop the eviction of its business does not somehow render the filing of this case, and all that came with the filing, reasonable. Viewed in the context of prior proceedings, including at least three different actions in two New York state courts, and at least four different bankruptcy cases, voluntary and involuntary, by or against three debtors, it is hard to avoid the conclusion that from the outset, this fifth bankruptcy case was filed to interfere with New York state court proceedings and a commercial eviction that had been pending, in one form and forum or another, for many years, since 2013, when the Foreclosure Action was commenced. There simply is not, and has not been, a bankruptcy purpose to this case or, it seems, its predecessors.

As to the fourth factor, the motivation and objectives behind the filing of the petition, here too, the record shows that this factor weighs in favor of an award of attorney's fees and costs, for substantially the same reasons.  That is, the record shows that Wide World was motivated to file this involuntary bankruptcy petition to delay the commercial eviction of its business from the property, as opposed to pursue a bankruptcy purpose.  This conclusion is supported not only by the record in this case, but also by the long and difficult path to the filing of this involuntary bankruptcy case, including multiple proceedings in this Court and New York state court.  And it is also supported by the record of some five bankruptcy cases here, each of which appears to have been filed without a legitimate bankruptcy purpose, and instead, principally or solely to impede proceedings brought by Mr. Amrusi in New York state court.

That is, and in sum, each of the factors identified by the Second Circuit in *In re TPG Troy* supports the presumption set forth in Bankruptcy Code Section 303(i)(1) that, upon the dismissal of this involuntary bankruptcy case "other than on consent of all petitioners and the debtor," Mr. Amrusi, as the alleged debtor, is entitled to judgment against the petitioning creditor, Wide World for "costs" and "a reasonable attorney's fee."  11 U.S.C. § 303(i)(1)(A), (B).

*The Appropriate Amount of an Award of Costs and Attorney's Fees Under Bankruptcy Code Section 303(i)(1)*

The Court next considers the appropriate amount of an award of "costs" and "a reasonable attorney's fee" to Mr. Amrusi under Bankruptcy Code Section 303(i)(1).

Commentators and courts agree that a sensible starting point to determine a "reasonable attorney's fee" for purposes of Section 303(i)(1) is the calculation of a "lodestar" amount – that is, the hours spent by the attorney multiplied by the rate charged for the attorney's time.  As the Collier treatise explains, "[a]t a minimum, the determination of reasonableness involves an assessment of the time spent and the rate charged at the prevailing market rate.  This produces

what is termed the 'lodestar.'" 2 Collier on Bankruptcy ¶ 303.33[4][b], at 303-113 (Richard Levin & Henry J. Sommer eds., 16th ed.).

More generally, courts within and outside the Circuit generally look to a "lodestar" assessment and calculation to determine the amount of a "reasonable" fee when that calculation is required. As one court in this District has held, "[i]t is now settled that the 'lodestar' method of fee calculation . . . is *the* method to be used to determine a 'reasonable' attorney fee in all the federal courts, including the bankruptcy courts." *In re Cena's Fine Furniture, Inc.*, 109 B.R. 575, 581 (E.D.N.Y. 1990) (emphasis in original) (citing cases). "The reasonableness of the hours expended is a 'critical lodestar component.'" *In re Polanco*, 626 B.R. 12, 23 (Bankr. E.D.N.Y. 2021) (quoting *In re Hanover*, 2020 WL 2554229, at *3 (Bankr. E.D.N.Y. May 19, 2020)). In determining the reasonableness of the hours expended, the Court must exclude time that is "excessive, redundant, or otherwise unnecessary." *Hensley v. Eckerhart*, 461 U.S. 424, 434 (1983). *See Sucre v. MIC Leasing Corp.* (*In re Sucre*), 226 B.R. 340, 352 (Bankr. S.D.N.Y. 1998) (applying *Hensley*). *See also In re Korea Chosun Daily Times, Inc.*, 337 B.R. 758, 767-68 (Bankr. E.D.N.Y. 2005); *In re Anmuth Holdings*, 600 B.R. at 190 (using "lodestar" analysis for purposes of Section 303(i)(1)(B)).

At the same time, in doing so, the Court must not penalize attorneys by viewing the efforts of counsel with the benefit of "20/20 hindsight." *In re Drexel Burnham Lambert Grp., Inc.*, 133 B.R. 13, 23 (Bankr. S.D.N.Y. 1991). "[H]ours for an activity or project should be disallowed only where a Court is convinced it is readily apparent that no reasonable attorney should have undertaken that activity or project or where the time devoted was excessive." *Id*.

And in this context, "'[b]ankruptcy courts enjoy wide discretion in determining reasonable fee awards.'" *In re Cenargo Int'l, PLC*, 294 B.R. 571, 596 (Bankr. S.D.N.Y. 2003)

(quoting *In re Raytech Corp.*, 241 B.R. 785, 788 (D. Conn. 1999)).  In exercising this discretion, the court may call upon its knowledge and experience in similar matters, and in the case at hand.

As the Second Circuit noted, "the Bankruptcy Court did not abuse its discretion in approving as reasonable [the firm's] final fee application" because the judge "presided over th[e] bankruptcy for its duration and had the opportunity to evaluate first-hand both the quality of [the firm's] performance and the contributions made by the firm." *Bernheim v. Damon & Morey, LLP*, 2007 WL 1858292, at *2 (2d Cir. June 28, 2007).  This discretion may call for careful attention to the record, including the billing records that support the professional's application.

As the Second Circuit has also observed, it may be necessary to "carefully and independently review[] the attorney time and expense reports to ensure that they were reasonable and commensurate with the tasks undertaken." *Dedvukaj v. GECMC 2007C-1 Burnett St., LLC (In re Hoti Enters.)*, 605 F. App'x 67, 68 (2d Cir. 2015).  *See* 2 Collier on Bankruptcy ¶ 303.33[4], at 303-112 to 303-114 (Richard Levin & Henry J. Sommer eds., 16th ed.) (citing cases); *In re Korea Chosun Daily Times*, 337 B.R. at 767; *In re Anmuth Holdings*, 600 B.R. at 190-91.

The reasonableness of the hourly rate is determined by considering "'that fee which is customarily charged in the local community by someone who possesses similar skill, experience, expertise, stature and reputation who is faced with similarly novel and complex issues and who procures comparable results.'" *In re Navis Realty, Inc.*, 126 B.R. 137, 140 (Bankr. E.D.N.Y. 1991) (quoting *In re Shades of Beauty, Inc.*, 56 B.R. 946, 951 (Bankr. E.D.N.Y. 1986), *aff'd*, 95 B.R. 17 (E.D.N.Y. 1988)).  Viewed another way, this calls for the Court to consider "prevailing market rates for attorneys with comparable skill and standing in the pertinent legal community." *In re Ridgemour Meyer Props., LLC*, 2018 WL 2305765 at *13 (Bankr. S.D.N.Y. May 18, 2018)

(citing *Kerin v. U.S. Postal Serv.*, 218 F.3d 185, 190 (2d Cir. 2000)).  And as the Second Circuit has noted, the court's review may well also encompass an assessment of "the hourly rates of competitors in the marketplace."  *In re Hoti Enters.*, 605 F. App'x at 68.  *See In re Korea Chosun Daily Times*, 337 B.R. at 767; *In re Anmuth Holdings*, 600 B.R. at 190-91.

At the outset, and as set forth in the parties' Joint Pre-Hearing Statement, the parties do not dispute that Mr. Amrusi, as the "[a]lleged Debtor[,] has incurred attorney's fees in connection with this involuntary bankruptcy."  Joint Pre-Hearing Statement at 3.

At the evidentiary hearing, Mr. Amrusi testified as to the amount of attorney's fees that he incurred.  He was asked by his counsel, referring to Exhibit A, "[d]oes that reflect the charges for work that I've done on this matter?", and he responded, "[y]es."  April 10, 2025, Hearing Tr. at 51:19-52:6.  And Mr. Amrusi was asked, "[d]oes it include everything?", and he responded, "[t]hat's what I see."  April 10, 2025, Hearing Tr. at 52:7-8.

Mr. Amrusi also offered as an exhibit the billing statement that he received from his attorney.  *See* Trial Exh. A (billing statement).  The billing statement shows that Mr. Amrusi incurred total charges of $20,950 for 41.9 hours at a rate of $500 per hour.  *See* Trial Exh. A.  Notably, this testimony and evidence was not objected to or rebutted by Wide World.  *See* April 10, 2025, Hearing Tr. at 52:13-15.

To be sure, Wide World notes that Mr. Amrusi did not present evidence that he paid those attorney's fees.  Wide World Post Hearing Statement at 5 n.7.  But Wide World does not cite persuasive authority to the effect that recovery of an attorney's fee under Section 303(i) is somehow contingent on the involuntary debtor having paid those fees.  And as one appellate court has explained:

> § 303(i)(1) is a fee-shifting provision, not a damages provision.  The distinction here is between those statutes which permit recovery of attorney's fees "as

> damages," *Sternberg v. Johnston*, 595 F.3d 937, 946 (9th Cir. 2010), and which are therefore "consistent with the American Rule," *id*., and those which permit the recovery of attorney's fees qua attorney's fees and therefore create an exception to the American Rule.  Section 303(i)(1) falls into the second category because, rather than providing for an award of attorney's fees as damages to compensate an individual injured by a wrongful act, its very function is to reallocate the costs of litigation to the prevailing debtor and to thus supersede the American Rule.

*Orange Blossom, LP v. S. Cal. Sunbelt Devs., Inc.* (*In re S. Cal. Sunbelt Devs., Inc.*), 608 F.3d 456, 463-64 (9th Cir. 2010).  *See In re Navient Sols., LLC*, 627 B.R. 581, 588 (Bankr. S.D.N.Y. 2021) (citing *In re S. Cal. Sunbelt Devs.*, 608 B.R. at 461-62); *In re Anmuth Holdings*, 600 B.R. at 187 (citing *In re S. Cal. Sunbelt Devs.*, 608 B.R. at 463).

The Court first considers whether the hours expended by Mr. Amrusi's attorney in responding to this involuntary bankruptcy case were reasonable.  As the Supreme Court has observed, time that is "excessive, redundant or otherwise unnecessary" must be excluded from this total.  *Hensley*, 461 U.S. at 434.  At the same time, as the Second Circuit has noted, "hours . . . should be disallowed only where . . . no reasonable attorney should have undertaken that activity or project or where the time devoted was excessive."  *In re Drexel Burnham Lambert Group, Inc.*, 133 B.R. at 23.

And here, the record includes the uncontroverted evidence, in the form of Mr. Amrusi's counsel's billing statement, that Mr. Amrusi's counsel, Jared Rich, Esq., expended some 41.9 hours in the course of representing him in this matter.  *See* Trial Exh. A.  That representation encompassed, among other tasks, responding to the involuntary bankruptcy petition, which was filed on December 21, 2023; opposing Wide World's Emergency Motion, which was heard by the Court on January 2, 2024; and responding to Wide World's Motion to Dismiss, which was heard by the Court on February 20, 2024, at which Wide World and Mr. Amrusi appeared and were heard.  And of course, that work also encompassed preparing and filing this Sanctions

Motion on February 13, 2024, and appearing at the evidentiary hearing on this Motion on April 10, 2025.

Viewed another way, over the twenty months that this involuntary bankruptcy case has been pending, Mr. Amrusi's counsel has filed at least six documents with the Court and appeared at some eleven hearings, including the evidentiary hearing on this Motion.

In this context, the record plainly supports the conclusion that the 41.9 hours expended on this matter by Mr. Amrusi's counsel were reasonable. The work performed was not excessive or redundant, the work performed was necessary and appropriate to the representation of Mr. Amrusi as the alleged involuntary debtor, and indeed, the tasks undertaken and the time devoted to them is well within a reasonable professional range.

The Court next considers whether the rate charged by Mr. Amrusi's attorney for his work in this matter was reasonable. This calls for the Court to consider rates and fees that are charged by attorneys of similar skill and experience for work in comparable matters. *See In re Navis Realty, Inc.*, 126 B.R. at 140.

And here, the record includes the uncontroverted evidence, in the form of Mr. Amrusi's counsel's billing statement, that Mr. Amrusi's counsel Mr. Rich charged a rate of $500 per hour for his work in this matter. *See* Trial Exh. A. Here too, neither the rate charged, nor the reasonableness of that rate, was challenged by Wide World. *See* April 10, 2025, Hearing Tr. at 52:13-15.

Here again, the Court is satisfied that the rate charged by Mr. Amrusi's counsel for his work in this case, $500 per hour, is well within the boundaries of a reasonable or prevailing market rate – and if anything, it is at the lower end of that range. *See In re Polanco*, 626 B.R. at

23 (stating that "$500 for attorney time and $200 for paralegal time, are reasonable [rates] in light of what would be customary in both bankruptcy and non-bankruptcy matters").

That is, here, the record shows that Mr. Amrusi incurred attorney's fees in the amount of $20,950, in connection with his counsel's representation of him in this involuntary bankruptcy case. The evidence also shows that this is a reasonable attorney's fee under the circumstances, based on a "lodestar" analysis, or "the number of reasonable hours expended, multiplied by a reasonable hourly rate." *Tokyo Electron Arizona, Inc. v. Discreet Industries Corp.* 215 F.R.D. 60, 62 (E.D.N.Y. 2003).

For these reasons, and based on the entire record, the Court finds and concludes that Mr. Amrusi is entitled to an award of $20,950 as a reasonable attorney's fee pursuant to Bankruptcy Code Section 303(i)(1) in connection with this involuntary bankruptcy case.

*Whether Mr. Amrusi Has Shown that He Is Entitled to an Award of Compensatory Damages Under Bankruptcy Code Section 303(i)(2)(A) and Punitive Damages Under Bankruptcy Code Section 303(i)(2)(B)*

The question of an award of compensatory damages under Bankruptcy Code Section 303(i)(2)(A) and punitive damages under Section 303(i)(2)(B) raises additional matters to be considered. This is because, at the outset, the predicate for consideration of an award of either type of damages is a determination that the "petitioner . . . filed the petition in bad faith." 11 U.S.C. § 303(i)(2).

That is, "an award [under Section 303(i)(2)] requires a finding of bad faith . . . [and] 'there is a presumption of good faith in favor of the petitioning creditor, and thus the alleged debtor has the burden of proving bad faith.'" *In re Anmuth Holdings*, 600 B.R. at 191 (quoting *In re Bayshore Wire Prods.*, 209 F.3d at 105) (alterations and omission in original).

So, the Court first considers whether Mr. Amrusi has shown that Wide World filed this involuntary bankruptcy case in bad faith.  And if so, then the Court must consider two additional matters – first, whether Mr. Amrusi has shown that he is entitled to an award of compensatory damages under Bankruptcy Code Section 303(b)(2)(A), and second, whether Mr. Amrusi has shown that he is entitled to an award of punitive damages under Bankruptcy Code Section 303(b)(2)(B).  Again, the Court considers these questions in turn.

### *Whether Mr. Amrusi Has Shown that this Involuntary Bankruptcy Case Was Filed in Bad Faith*

In order to ascertain whether the requirement of bad faith has been met, courts look to the facts and circumstances of the particular situation.  As with many questions that turn on whether a party has acted in bad faith, a damages award under Section 303(i)(2), whether compensatory or punitive, simply does not turn on a checklist or one-size-fits-all mode of analysis.

Courts often look to the same factors that are weighed in a "totality of the circumstances" review, including "'(1) the merits of the involuntary petition; (2) the role of any improper conduct on the part of the alleged debtor; (3) the reasonableness of the actions taken by the petitioning creditors; and (4) the motivation and objectives behind the filing of the petition.'" *In re Taub*, 438 B.R. at 775 (quoting 2 Collier on Bankruptcy ¶ 303.33[1], at 303-107 (Richard Levin & Henry J. Sommer eds., 16th ed.)).

In addition, courts have identified several additional considerations that may weigh for or against a finding of bad faith.  As one bankruptcy court noted, these factors may include, but are not limited to, the following:

> "[T]he creditors satisfied the statutory criteria for filing the petition; the involuntary petition was meritorious; the creditors made a reasonable inquiry into the relevant facts and pertinent law before filing; there was evidence of preferential payments to certain creditors or of dissipation of the debtor's assets; the filing was motivated by ill will or a desire to harass; the petitioning creditors used the filing to obtain a disproportionate advantage for themselves rather than to

> protect against other creditors doing the same; the filing was used as a tactical
> advantage in pending actions; the filing was used as a substitute for customary
> debt-collection procedures; and the filing had suspicious timing."

*In re CNG Foods LLC*, 2020 WL 4219679, at *11 (Bankr. E.D.N.Y. July 13, 2020) (declining to

adopt a single specific test to determine bad faith) (quoting *In re Forever Green Athletic Fields,*

*Inc*., 804 F.3d 328, 334 (3d Cir. 2015)).

And finally, courts recognize that as a practical matter, the different tests that have been

articulated to assess bad faith may well not be so different in their application. As one court

noted, "[c]ourts have noted that 'findings of bad faith under the above referenced tests often

overlap.'" *In re CNG Foods*, 2020 WL 4219679, at *11 (quoting *In re Landmark Distribs., Inc*.,

189 B.R. 290, 310 (Bankr. D.N.J. 1995). As another court observed, "we see no need to choose

among the various tests for bad faith in disposing of this case." *In re Bayshore Wire Prods.*,

209 F.3d at 106. In the end, a finding of bad faith should not be typical or common, and it

should not be a close call.

Here, Mr. Amrusi points to several factors in support of his assertion that Wide World

filed this involuntary bankruptcy petition in bad faith. One consideration is the long history of

proceedings, including actions in two New York state courts and four different prior bankruptcy

cases. Amrusi Post Hearing Statement at 3. Notably, Mr. Amrusi prevailed in those New York

state court actions, and each of those bankruptcy cases was dismissed. Another is, as Mr.

Amrusi asserts, that Wide World "had no valid claim against" him and is not a creditor, and

instead, filed this case as yet one more effort to forestall the eviction of Wide World's used car

and truck dealership from the commercial premises owned by Mr. Amrusi. Amrusi Post Hearing

Statement at 3. And he points to the "broader documented pattern of serial abuses of the

bankruptcy system by [Wide World] and its principal David Vaknin." *Id*.

Wide World responds that it "does not defend the filing of its petition, other than noting that it is a creditor of Amrusi." Wide World Post Hearing Statement at 2. It invites the Court to "draw whatever conclusions it believes are appropriate regarding the purpose, motivation, and [bona] fides of the filings at issue in this case, other than as set forth below." Wide World Post Hearing Statement at 3.

So here, the Court first considers the facts and circumstances and the "totality of the circumstances" to assess whether the requirement of bad faith has been met. *In re TPG Troy*, 793 F.3d at 235. These include "(1) the merits of the involuntary petition; (2) the role of any improper conduct on the part of the alleged debtor; (3) the reasonableness of the actions taken by the petitioning creditors; and (4) the motivation and objectives behind the filing of the petition." *Id*. And here, this analysis follows the same path that led to the Court's conclusions above.

As to the first of these factors, the merits of the involuntary petition, and as noted above, it is plain from the record that this involuntary bankruptcy petition lacks merit. At the outset, it appears from the record that Wide World is not a creditor of Mr. Amrusi – and even if somehow it was, Wide World's claim is subject to a "bona fide dispute as to liability or amount." 11 U.S.C. § 303(b)(1).

As to the second of these factors, the role of any improper conduct by Mr. Amrusi, and again as noted above, there simply is no evidence in the record that there has been improper conduct by Mr. Amrusi.

As to the third of these factors, the reasonableness of the actions taken by Wide World, here, the record shows that the path of this involuntary case, and the proceedings that preceded it, including at least three different actions in two New York state courts and at least five different voluntary and involuntary bankruptcy cases by or against three debtors, Wide World's

commencement of this involuntary bankruptcy petition was not motivated by a legitimate bankruptcy purpose, and instead, occurred for the principal purpose of interfering with the pending proceedings in New York state court.

Finally, and for similar reasons, the fourth factor, the motivation and objectives leading to Wide World's filing of this involuntary bankruptcy petition by Wide World against Mr. Amrusi, similarly point to the conclusion that the filing of this case was not motivated by a bankruptcy purpose, or undertaken to realize a bankruptcy objective.

That is, each of the factors identified by in *In re TPG Troy*, supports the conclusion that this involuntary bankruptcy case was filed by Wide World in bad faith.

And a review of the considerations identified in *In re CNG Foods* leads to the same conclusion.  That is, here, the record shows that Wide World has *not* "'satisfied the statutory criteria for filing the petition.'"  *In re CNG Foods*, 2020 WL 4219679, at \*11 (quoting *In re Forever Green*, 804 F.3d at 336).  Nor has it shown that "'the involuntary petition was meritorious,'" or that it "'made a reasonable inquiry into the relevant facts and pertinent law before filing.'"  *Id*.  Instead, here, the record shows that "'the filing was motivated by ill will or a desire to harass'" Mr. Amrusi, and that it "'was used as a tactical advantage in pending actions,'" marked by "'suspicious timing,'" in an attempt to stay the eviction of Wide World's used car and truck dealership from the Property.  *Id*.

That is, and in sum, each of the factors identified in *In re TPG Troy*, and the relevant considerations identified in *In re CNG Foods*, point to the conclusion that this involuntary bankruptcy case was filed by Wide World against Mr. Amrusi in bad faith.

*Whether Mr. Amrusi Is Entitled to an Award of Compensatory Damages Under Bankruptcy Code Section 303(i)(2)(A)*

When bad faith is shown, the court moves to the second step of the inquiry – the determination as to whether it is appropriate to make an award of damages, whether compensatory or proximately caused damages under Section 303(i)(2)(A), or punitive damages under Section 303(i)(2)(B).

In the context of Section 303(i)(2)(A), an aggrieved alleged debtor may recover "any damages proximately caused by such filing." 11 U.S.C. § 303(i)(2)(A). These may include "any damages proximately caused by such filing." *Id*. And the "burden is on the alleged debtor to establish the nature and the extent of its damages." *Id*. As one commentator has stated:

> To obtain damages, the debtor's business does not need to be operating. The requirement is that the damages be proximate. They also need to be quantifiable if an award is to be made. Asserting that the stigma of bankruptcy damaged a debtor's business reputation and hurt goodwill is not, in and of itself, sufficient evidence. There must be evidence supporting a damage claim.

2 Collier on Bankruptcy ¶ 303.33[6][a], at 303-115 (Richard Levin & Henry J. Sommer eds., 16th ed.) (citations omitted). The claim must be "calculable with a reasonable degree of certainty." *In re Anmuth Holdings*, 600 B.R. at 201. Or, as another court found, "[s]uch an award should be fashioned to compensate [the involuntary debtor] for its damages, calculable with a reasonable degree of certainty, proximately caused by the improper filing." *In re John Richards Homes Bldg. Co.*, 291 B.R. 727, 735 (Bankr. E.D. Mich. 2003)), *aff'd*, 439 F.3d 248, 265-66.

Here, the record shows that Mr. Amrusi offered evidence, in the form of testimony and exhibits, that the filing of this involuntary bankruptcy case has harmed him in a variety of ways. He testified and offered exhibits, including letters from several banks in the months following the bankruptcy filing, which, in some instances, specifically addressed the bankruptcy filing,

showing it caused him to lose credit cards and lines of credit and that it lowered his credit score. *See* Trial Exhs. B, C, D, E, F (letters stating that accounts will be closed); April 10, 2025, Hearing Tr. at 36:7-39:1 (describing loss of approximately $90,000 in lines of credit).  Mr. Amrusi also testified that he had used several of these cards for many years – in one circumstance, as many as thirty-two years.  April 10, 2025, Hearing Tr. at 24:18.  And he testified that it harmed his credit score, "I used to have a credit score over 800 always. Now, it's no more – less than 700, I mean.  Less than 700.  Every time I apply for something, they always – they always deny it."  April 10, 2025, Hearing Tr. at 48:14-16.

Mr. Amrusi also offered testimony to support his assertion that, as a consequence, he may have been denied a car lease and loan to pay part of the expenses on a construction project.  He testified:

> I can't – I can't rent a car.  I try to rent a car.  I have already two or three inquiry.  Every time I [try to], I get [an] inquiry.  So [the] inquiry make[s] my – my score more down, and I lose another credit . . . I try to build my – my house, and I – I make – I pay 50,000 dollars just to have a permit.  And I cannot build.  I cannot give – take money from the bank.  Every time I go over there, they refuse me.  They say, you cannot get credit.  Your credit very bad.

April 10, 2025, Hearing Tr. at 50:25-51:9.  *See* April 10, 2025, Hearing Tr. at 82:2-16 (addressing impact of the bankruptcy case filing on a planned construction project).

And he testified and offered exhibits, including solicitation letters from firms offering services to bankruptcy debtors, in support of his assertion that his business and personal reputation has been injured.  *See* Trial Exhs. J (1 $ Wiser Consumer Education Inc.), K (Sage Personal Finance).

The Court finds that Mr. Amrusi's testimony was substantive, persuasive, and credible.  But while Mr. Amrusi has surely testified and offered exhibits showing that he has been subjected to significant hardship as a result of Wide World's actions, he has not demonstrated

that he is entitled to an award of compensatory damages under Bankruptcy Code Section 303(i)(1), for several reasons.  Mr. Amrusi has not established that he has suffered quantifiable damages, or damages that are "calculable with a reasonable degree of certainty."  *In re Anmuth Holdings*, 600 B.R. at 201.  And while he testified credibly and persuasively that his access to credit, including via long-standing lines of credit and his credit score, have been negatively impacted, he did not connect that to specific and measurable loss.  Similarly, while Mr. Amrusi testified to damage to his business reputation, "[a]sserting that the stigma of bankruptcy damaged a debtor's business reputation . . . is not, in and of itself, sufficient [to support] a damage claim." 2 Collier on Bankruptcy ¶ 303.33[6][a], at 303-115 (Richard Levin & Henry J. Sommer eds., 16th ed.).

For these reasons, and based on the entire record, the Court finds and concludes that Mr. Amrusi is not entitled to an award of compensatory damages pursuant to Bankruptcy Code Section 303(i)(2)(A) in connection with this involuntary bankruptcy case.

### *Whether Mr. Amrusi Is Entitled to an Award of Punitive Damages Under Bankruptcy Code Section 303(i)(2)(B)*

In the context of Section 303(i)(2)(B), an aggrieved alleged debtor may claim "punitive damages."  11 U.S.C. §303(i)(2)(B).  Notably, as the statute makes clear, punitive damages may be available and warranted even where no compensatory or actual damages are shown.  As one bankruptcy court explained, "[p]unitive damages under § 303(i)(2) may be awarded whether or not there is proof of actual damages."  *In re Anmuth Holdings*, 600 B.R. at 202.  And as the Ninth Circuit has noted, "Section 303(i)(2) expressly authorizes a standalone award of punitive damages."  *In re S. Cal. Sunbelt Devs.*, 608 F.3d at 465.

Courts likewise agree that where the requirements are met, an aggrieved alleged debtor may recover both its attorney's fees and a punitive damages award.  As one court observed,

"[t]he legislative history of Section 303(i) indicates the use of the term 'or' is not exclusive, and therefore punitive damages, if appropriate, may be added to an award of costs and reasonable attorneys' fees." *Jaffe v. Wavelength Inc.* (*In re Wavelength, Inc.*), 61 B.R. 614, 619 (9th Cir. B.A.P. 1986).

Instead, all that is necessary to warrant consideration of a punitive sanction is "a finding that the involuntary petition was filed in bad faith." *In re Anmuth Holdings*, 600 B.R. at 202-03 (citing *In re TPG Troy*, 793 F.3d at 235).   This is because "[t]he purpose of punitive damages under § 303(i)(2) is to punish a wrongdoer and deter similar conduct in the future." *In re Anmuth Holdings* (citing *In re Grecian Heights Owners' Ass'n*, 27 B.R. 172, 174 (Bankr. D. Or. 1982)).  And "[u]nlike compensatory damages, punitive damages are neither measured by actual loss nor are they measured strictly in light of the impact of the creditor's bad faith on the alleged debtor." *In re Silverman*, 230 B.R. 46, 52 (Bankr. D.N.J. 1998).

In assessing punitive damages, courts may consider the entire record and look to the totality of the circumstances.  As one bankruptcy court observed, "[i]n determining the amount sufficient to serve the dual purposes of punitive damages, courts generally consider the degree and nature of the wrong to the debtor, the intent of the creditors, and any surrounding aggravating or mitigating circumstances." *In re Anmuth Holdings*, 600 B.R. at 202-03 (citing *In re Meltzer*, 535 B.R. 803, 815 (Bankr. N.D. Ill. 2015)).

In addition, "[t]he totality of the circumstances approach considers factors such as the petitioning creditors' net worth and the gravity of the consequences caused by the involuntary filing." *In re Anmuth Holdings*, 600 B.R. at 202-03 (citing *In re Silverman*, 230 B.R. at 54). *See In re CNG Foods*, 2020 WL 4219679, at *24 (same) (citing *In re Anmuth Holdings*, 600 B.R. at 202-03).

At the same time, as the Supreme Court has found and bankruptcy courts recognize, a punitive damages award is bounded by considerations of due process:

> A punitive damages award must also be considered in light of the Due Process Clause of the Fourteenth Amendment.  U.S. Const. amend. XIV, § 1.  Punitive damages offend due process if an award is grossly excessive in relation to the legitimate interests of punishment and deterrence.  *See State Farm Mut. Auto. Ins. Co. v. Campbell*, 538 U.S. 408, 409, 123 S. Ct. 1513, 155 L.Ed.2d 585 (2003).

*In re Anmuth Holdings*, 600 B.R. at 202-03.

Courts have identified several factors to be weighed in determining whether and to what extent a punitive damages award is warranted.  As one bankruptcy court explained:

> In determining whether a punitive damages award is grossly excessive, the court considers the degree of reprehensibility of the defendant's conduct; considers the ratio between the punitive damages award and the amount of actual damages; and compares "the punitive damages award and the civil or criminal penalties that could be imposed for comparable misconduct." *In re John Richards Homes*, 291 B.R. 727 at 738 (citing *BMW of North America, Inc. v. Gore*, 517 U.S. 559, 575 (1996)), *aff'd*, 312 B.R. 849 (E.D. Mich. 2004), *aff'd*, 439 F.3d 248 (6th Cir. 2006).

*In re Anmuth Holdings*, 600 B.R. at 202-03.

And finally, while there is not a fixed boundary or ratio between an appropriate punitive damages award and the associated compensatory and other damages, including attorney's fees, courts recognize some general guidance:

> Although the Supreme Court has declined to adopt a "bright-line ratio which a punitive damages award cannot exceed," it has noted that, "in practice, few awards exceeding a single-digit ratio between punitive and compensatory damages, to a significant degree, will satisfy due process." *State Farm*, 538 U.S. at 425.

*In re Anmuth Holdings*, 600 B.R. at 203.  *See In re John Richards Homes*, 291 B.R. at 738-39 (noting that a ratio as high as 10:1 has been upheld by the Supreme Court).

The Court begins with the criteria set forth in *In re Anmuth Holdings*, including "the degree and nature of the wrong to the debtor, the intent of the creditors, and any surrounding aggravating or mitigating circumstances." *In re Anmuth Holdings*, 600 B.R. at 202-03.

As to the first criterion, the degree and nature of the wrong to Mr. Amrusi, here, the record shows that the filing of this involuntary bankruptcy case has harmed Mr. Amrusi in several ways. As described above, he has suffered tangible loss in the form of the cancellation of long-standing credit cards and credit lines and damage to his credit score. It disrupted his ongoing personal and commercial business activities, including planned construction projects, and interfered with his ability to lease a car.

And Mr. Amrusi has also been injured in less tangible ways, including in damage to his business and personal reputation. While this Court has determined that Mr. Amrusi has not established quantifiable damages, or damages that are "calculable with a reasonable degree of certainty" in respect of these matters, that is distinct from the question of whether he has demonstrated that he has been wronged. *In re Anmuth Holdings*, 600 B.R. at 201. These considerations weigh in favor of an award of punitive damages.

As to the second criterion, the intent of Wide World, here, the record shows – as this Court has already found – that Wide World filed this involuntary bankruptcy case against Mr. Amrusi in bad faith. Both this bankruptcy case and the long path leading to it point inescapably to the conclusion that this involuntary bankruptcy petition lacks merit. Wide World is not a creditor of Mr. Amrusi, and even if somehow it was, any claim it might have would be subject to a "bona fide dispute as to liability or amount." 11 U.S.C. § 303(b)(1). Upon filing the petition, Wide World promptly sought emergency relief to stay the eviction of its used car and truck dealership from the Property owned by Mr. Amrusi – relief that it had sought unsuccessfully in

at least three different actions in two New York state courts and at least five different bankruptcy voluntary and involuntary bankruptcy cases by or against three debtors. And once that relief was denied, Wide World effectively abandoned the case. These matters also weigh in favor of punitive damages.

As to the third criterion, the presence of any surrounding aggravating or mitigating circumstances, Wide World has pointed to the fact that, in substance, it has not offered a substantive defense to this Sanctions Motion and defers to the Court to make an appropriate determination. Rather, it states that it "does not defend the filing of its petition, other than noting that it is a creditor of Amrusi." Wide World Post Hearing Statement at 2. And it acknowledges:

> [It] does not contest Amrusi's testimony as to the chronology of prior legal proceedings including bankruptcy filings and that the bankruptcy filings delayed state court eviction proceeding (Tr. 11), David Vaknin being the principal of Wide World (Tr. 7), and Amrusi losing $90,000 worth of credit from five cards as a result of the filing, as set forth in his credit report.

*Id*. Wide World invites the Court to, in substance, "draw whatever conclusions it believes are appropriate regarding the purpose, motivation, and [bona] fides of the filings at issue in this case." Wide World Post Hearing Statement at 3. Here as well, these circumstances support a punitive damages award.

For these reasons, and based on the entire record, the Court finds and concludes that Mr. Amrusi is entitled to an award of punitive damages pursuant to Bankruptcy Code Section 303(i)(2)(B).

The Court next considers the question of the appropriate amount of a punitive damages award here. As a starting point, "[t]he purpose of punitive damages under § 303(i)(2) is to punish a wrongdoer and deter similar conduct in the future." *In re Anmuth Holdings*, 600 B.R. at 2023 (citing *In re Grecian Heights Owners' Ass'n*, 27 B.R. at 174. And while "punitive damages

are neither measured by actual loss nor . . . strictly in light of the impact of the creditor's bad faith on the alleged debtor,'" those circumstances may serve as helpful wayposts in assessing the appropriate amount of an award. *In re Anmuth Holdings*, 600 B.R. at 202 (quoting *In re Silverman*, 230 B.R. at 52).

Both Supreme Court authority and prudent judicial restraint point in the direction of thoughtful and careful assessment of a punitive sanction. As the Supreme Court has observed, "in practice, few awards exceeding a single-digit ratio between punitive and compensatory damages, to a significant degree, will satisfy due process." *State Farm Mut. Auto. Ins. Co. v. Campbell*, 538 U.S. 408, 425 (2003). Due process concerns may also be implicated "if an award is grossly excessive in relation to the legitimate interests of punishment and deterrence." *In re Anmuth Holdings*, 600 B.R. at 203 (citing *State Farm*, 538 U.S. at 409).

Here, the record shows that, as a consequence of Wide World's bad faith filing of this involuntary bankruptcy petition, Mr. Amrusi has incurred fees in the amount of $20,950. This Court has already concluded that pursuant to Bankruptcy Code Section 303(i)(1), Mr. Amrusi is entitled to an award in that amount against Wide World as a reasonable attorney's fee. But that award is only part of the picture where, as here, the record demonstrates the petitioning creditor's bad faith and the absence of any improper conduct by the alleged debtor.

And here, the record also shows that this involuntary bankruptcy case was part of a broader campaign by Wide World to prevent a court-ordered eviction of its used car and truck dealership, through a series of actions in New York state court and in several voluntary and involuntary bankruptcy cases, culminating in this one. To be sure, punitive damages would not likely be appropriate in response to a litigant's legitimate and good faith – even aggressive – pursuit of its claims and defenses. But when it is clear from the record that the use of the courts,

51

including the bankruptcy court, and the use of court procedures, including the filing of an involuntary bankruptcy case, has crossed the line from good faith to bad faith, then punitive damages may well be warranted.

In light of all of these considerations, and based on the entire record, the Court finds and concludes that a punitive damages award in the amount of two times the attorney's fees incurred by Mr. Amrusi, or $41,900, is warranted.  The Court also finds and concludes that an award in this amount satisfies the purpose of "punish[ing the] wrongdoer and deter[ring] similar conduct in the future."  *In re Anmuth Holdings*, 600 B.R. at 202.  Wide World has not argued or presented evidence to show that this award would be disproportionate to its "net worth."  *In re Anmuth Holdings*, 600 B.R. at 202-03.  And the Court finds and concludes that an award of this amount, or two times the attorney's fees awarded, is well within the boundaries of a permissible sanction, proportionate to the circumstances, and reasonably calculated to punish Wide World and to deter similar conduct in the future.

*Whether Mr. Amrusi Is Entitled to an Order Sealing the Records in this Involuntary Bankruptcy Case Under Bankruptcy Code Section 303(k)(1) and Prohibiting Consumer Reporting Agencies from Making Any Consumer Report that Contains Information About this Case Under Bankruptcy Code Section 303(k)(2)*

Mr. Amrusi requests that the record in this case be sealed pursuant to Bankruptcy Code Section 303(k)(1), and that the Court "'enter an order prohibiting all consumer reporting agencies . . . from making any consumer report . . . that contains any information relating to such petition or to the case commenced by the filing of such petition.'"  Sanctions Motion at 11-12 (quoting 11 U.S.C. § 303(k)(2)) (omissions in original).

In response, Wide World notes that the Court dismissed the involuntary bankruptcy petition on its application, and states that it has "consented to sealing of all records of the court relating to this petition [pursuant to Section] 303(k)(1) and [to] prohibiting consumer reporting

agencies from making any consumer report that contains any information related to the bankruptcy petition [pursuant to Section] 303(k)(2)."  Wide World Post Hearing Statement at 5-6.

Bankruptcy Code Section 303(k)(1) and 303(k)(2) fill important roles in the bankruptcy process for an alleged debtor that has been subject to an unwarranted involuntary bankruptcy filing.  As the Collier treatise notes, "Section 303 is sometimes used as a means of harassment; even if the wrongfully-filed cases are dismissed (after effort to be sure), they result in serious consequences for the victims of the wrongful filings."  2 Collier on Bankruptcy ¶ 303.37[1], at 303-123 (Richard Levin & Henry J. Sommer eds., 16th ed.).  Relief under Bankruptcy Code Section 303(k) can assist the involuntary debtor in remedying some of these consequences, by sealing the court records and preventing consumer reporting agencies from including information about the filing in their reports.

Section 303(k)(1) provides:

> If (a) the petition . . . is false or contains any materially false, fictitious or fraudulent statement; (b) the debtor is an individual; and (c) the court dismisses such petition, the court, upon the motion of the debtor, shall seal all the records of the court relating to such petition, and all references to such petition.

11 U.S.C. § 303(k)(1).

Here, the record shows that the requirements for relief under Section 303(k)(1) are met.  The involuntary bankruptcy petition contains a "materially false, fictitious or fraudulent statement," because – at the very outset – that petition describes Wide World as a creditor of Mr. Amrusi.  In addition, the alleged debtor here, Mr. Amrusi, is an individual, and the Court has dismissed the petition.  And Mr. Amrusi has made a motion for relief under Section 303(k)(1).  Notably, Wide World consents to this relief.

For these reasons, and based on the entire record, the Court finds and concludes that Mr. Amrusi is entitled to an order sealing the records of this involuntary bankruptcy petition under Bankruptcy Code Section 303(k)(1).

Section 303(k)(2) provides:

> If the debtor is an individual and the court dismisses a petition under [Section 303], the court may enter an order prohibiting all consumer reporting agencies . . . from making any consumer report . . . that contains any information relating to such petition or to the case commenced by the filing of such petition.

11 U.S.C. § 303(k)(2).

Here, the record also shows that the requirements for relief under Section 303(k)(2) are likewise satisfied. The alleged debtor – Mr. Amrusi – is an individual, and the Court has dismissed the involuntary bankruptcy petition. And again, Wide World consents to this relief.

For these reasons, and based on the entire record, the Court finds and concludes that Mr. Amrusi is entitled to an order directing all consumer reporting agencies not to make any consumer report that contains any information relating to this involuntary bankruptcy petition or the bankruptcy case that it commenced under Bankruptcy Code Section 303(k)(2).

## Conclusion

In sum, and for the reasons set forth herein, and based on the entire record:

(i)     the Court finds and concludes that pursuant to Bankruptcy Code Section 303(i)(1), Mr. Amrusi is entitled to an attorney's fee award of $20,950 against Wide World;

(ii)    the Court finds and concludes that pursuant to Bankruptcy Code Section 303(i)(2)(A), Mr. Amrusi is not entitled to an award of compensatory damages;

(iii)   the Court finds and concludes that pursuant to Bankruptcy Code Section 303(i)(2)(B), Mr. Amrusi is entitled to a punitive damages award against Wide

World in the amount of two times the attorney's fees incurred by Mr. Amrusi, or $41,900;

(iv)    the Court finds and concludes that pursuant to Bankruptcy Code Section 303(k)(1), Mr. Amrusi is entitled to an order sealing the records of this involuntary bankruptcy petition at ECF Nos. 1, 2, 4, and 22; and

(v)    the Court finds and concludes that pursuant to Bankruptcy Code Section 303(k)(2), Mr. Amrusi is entitled to an order directing all consumer reporting agencies not to make any consumer report that contains any information relating to this involuntary bankruptcy petition or the bankruptcy case that it commenced.

The Court will enter an order in accordance with this Memorandum Decision simultaneously herewith.



Dated: Brooklyn, New York
September 30, 2025

_____
**Elizabeth S. Stong**
**United States Bankruptcy Judge**